[S. F. No. 21950.    In Bank.    Apr. 26, 1966.]

Estate of CHARLES S. ASH, Deceased. JOSEPH HAUCK, as Trustee, etc., et al., Petitioners and Respondents, v. JAMES LARKIN, as Administrator With the Will Annexed, etc., et al., Objectors and Appellants.

W. T. Fitzgerald, L. Martin Blaha and Morrison, Foerster, Holloway, Clinton & Clark for Objectors and Appellants.

John A. Sproul for Petitioners and Respondents.

PEEK, J.—This is an appeal by the personal representatives of the estate of Frank Ash from a minute order construing paragraph 11 of the will of Charles S. Ash, Frank's cousin. Respondents are the named trustees of a certain Trust B established by that will.

The order is appealable under section 1240 of the Probate Code as a determination of persons to whom trust property should pass, and the sole question presented is whether the court properly found that Frank Ash's remainder interest in Trust B lapsed because he failed to survive the life-income beneficiary.

Charles S. Ash died in 1959. His will, after making specific gifts, provided that the residue should be disposed of as follows:

1. If testator's wife should survive him, one-half of the residue was to be placed in a trust (Trust A) and the wife was to receive the entire net income of the trust during her lifetime. If such income did not amount to $12,000 per year the trustees were authorized to invade the corpus for the deficiency. Trust A was to terminate at the wife's death. She

was given a testamentary power of appointment over the corpus and undistributed income, but in default of appointment such income and the corpus were to go to certain named persons and institutions in specific amounts as listed in paragraph 10 of the will. Among the gifts in default of appointment so listed was the following:

"My said cousin, FRANK ASH, the sum of $10,000, and if he shall predecease the termination of said trust, said sum shall be paid to his wife, if she be living."

2. If the testator's sister should survive him, one-half of the residue was to be placed in a trust (Trust B) and the sister was to receive 75 percent of the net income of this trust during her lifetime, the remainder of the income to be accumulated. Trust B was to terminate on the sister's death if she survived the wife, but if she did not survive the wife, Trust B was to continue until the wife's death, with income to be accumulated. Upon the termination of Trust B, according to paragraph 11 of the will, the corpus and undistributed income was to be divided among the persons and institutions listed in paragraph 10 "in the amounts and proportions and under the conditions providing for the distribution and pro ration of the residue therein set forth."

3. If the testator's wife should predecease him, Trust A was to lapse, and the one-half of the residue which would have been its corpus was, upon the testator's death, to be divided among the persons and institutions listed in paragraph 10 "in the amounts and proportions and under the conditions providing for the distribution and pro ration of the residue therein set forth."

4. If the testator's sister should predecease him, but his wife should survive him, Trust B was to lapse and the one-half of the residue which was to be its corpus was, upon the testator's death, to be placed in a trust known as Trust A-1. The income of this trust was to accumulate and the corpus and undistributed income was, at the wife's death, to be divided among the persons and institutions listed in paragraph 10 "in the amounts and proportions and under the conditions providing for the distribution and pro ration of the residue therein set forth."

5. If the wife, during the administration of any trust created for her benefit, suffered any injury or disability necessitating extraordinary expenses of any kind, the trustees were given a discretionary power, after exhaustion of the wife's separate property and estate, to invade the corpus of Trust A, the accumulated income and corpus of Trust B, and

the corpus of Trust A-1, if it be set up, in sums deemed by them necessary to meet those expenses. This power was limited by the proviso that no more than 25 percent of the corpus of Trust B could be expended for this purpose during the lifetime of the testator's sister.

6. If the sister, during the administration of the trust created for her benefit, suffered any injury or disability necessitating extraordinary expenses of any kind, the trustees were given a discretionary power, after the exhaustion of the sister's separate property and estate, to invade the accumulated income and corpus of Trust B in sums deemed by them necessary to meet those expenses. This power was limited by the proviso that no more than 75 percent of the corpus of Trust B could be expended for this purpose during the lifetime of the testator's wife.

Charles S. Ash was survived by his wife Cora, his sister Marie, and his cousin Frank. Therefore, Trusts A and B arose upon his death. In 1961 Charles' wife Cora died without exercising her testamentary power of appointment as to Trust A. In 1963 Charles' cousin Frank died, predeceased by his wife and leaving no lineal descendents. In 1964 Charles' sister Marie died.

It is clear that paragraph 10 of the will conditions Frank Ash's remainder interest in Trust A upon his survival beyond the termination of that trust.[1] Further, since the termination of Trust A could come about only through the death of the testator's wife, Cora, his interest therein was necessarily conditioned upon his surviving her. The parties agree that that condition was satisfied by Frank Ash and that his interest in Trust A therefore vested upon Cora's death.

It is also clear that Frank Ash's remainder interest in Trust B is conditioned upon survival. The will directs that all remainders deriving from Trust B are to be distributed upon

---

[1] It is possible to read the bare language of the gift to Frank Ash as creating an interest subject to no conditions of survival but subject to defeasance in the event of Frank's death prior to "the termination of said trust" *together with* his wife's survival beyond such termination—so that his death prior to termination would not affect his gift if his wife predeceased him, as she did in fact. This construction, rendering remainders in both trusts indefeasibly vested upon Frank's survival of his wife, would make the date upon which each trust terminated relevant only for purposes of determining when each remainder should take effect in possession. However, an examination of the several other gifts listed in paragraph 10 leads to the conclusion that the testator did not intend any gift in that paragraph to vest upon his death absent his wife's prior death, and that he did intend that each be conditioned upon survival of the particular beneficiary or his designated alternate beyond "the termination of said trust."

the termination of that trust, again "under the conditions" of paragraph 10. That paragraph, as it relates to Frank Ash's interest, conditions his interest upon survival beyond the termination of "said trust." The question is whether the quoted words, which so clearly refer to Trust A in matters concerned with the distribution of remainders in that trust, also refer to Trust A in matters concerned with the distribution of remainders in Trust B—so that the condition requires survival beyond the termination of Trust A rather than survival beyond the termination of Trust B.

The question presented may be more helpfully stated in terms of survival beyond lives in being. Thus, as above indicated, the termination of Trust A could occur only upon the death of the income beneficiary, the testator's wife. The termination of Trust B, however, is not tied to the death of a single person but is instead geared to the joint lives of two persons, i.e., the testator's wife and the testator's sister, termination to occur at the death of the last to die. We are thus faced with this inquiry: Was it the intent of Charles Ash that Frank Ash's remainder in Trust B be conditioned upon his survival of the testator's wife, or was it his intent that the interest be conditioned upon his survival of the joint lives of the testator's sister and the testator's wife?[2] If the former, Frank Ash satisfied the condition and should take; if the latter, Frank Ash failed to satisfy the condition and his gift lapsed upon his death.

The specific wording of the will of Charles Ash indicates that the event upon the occurrence of which all remainders were intended to vest was the death of the testator's wife, Cora. As we have construed that portion of paragraph 10 relating to Frank Ash (see fn. 1, *supra*), his gift derived from Trust A was conditioned solely upon his survival of the termination of the "said trust" referred to in that paragraph, which "said trust" is clearly Trust A. As to Trust B, para-

---

[2] The above statement of the controversy shows that appellants' reliance on the common law presumption of early vesting is misplaced. That presumption is a rule of construction providing that no conditions of survival will be recognized unless they are explicitly stated, and that such conditions will not be implied from the fact that a gift is to take effect in possession upon the occurrence of a given event. (See *Estate of Ritzman*, 186 Cal. 567 [199 P. 783].) In the instant case it is clear that Frank Ash's interest in Trust B *was* subject to a condition of survival, the only question being which of two events he had to survive in order to take. The common law rule certainly does not require that when a court is uncertain as to which of two events the testator intended that the remainderman should survive in order to take, it must assume that he intended the one which happened to occur first.

graph 11 of the will directs that, upon the termination of that trust through the death of the testator's sister, she being predeceased by the testator's wife, the residue of the trust was to be distributed "under the conditions" set forth in paragraph 10. Since the sole condition set forth in paragraph 10 is that Frank Ash survive the termination of Trust A, his fulfillment of that condition resulted in the vesting of his interest in each trust. In the face of language so clearly directing simple *incorporation,* and in the absence of any language authorizing the kind of *transposition* required to read the incorporated portion as respondents would have it read, the indicated result must follow.

The overall testamentary plan supports this conclusion. It appears that testator had two primary purposes. First, he wished to take advantage of the tax benefit afforded by a marital deduction trust. Second, he wished to assure the comfort of his wife during the remainder of her lifetime. The importance of the testator's primary nontax purpose is illustrated by a comparison between the provisions relating to his wife and those relating to the secondary object of concern, his sister.

In addition to providing a guaranteed minimum income for the wife (a benefit not conferred upon the sister), the plan carefully insures that she command powers of invasion adequate to provide for emergency expenses arising from disability. The powers so provided are extensive. Thus, there was provided not only an invasion power relative to Trust A, the marital trust, but also a power relative to the nonmarital trust. The effectiveness of the power over the nonmarital trust was secured through two special provisions. The first of these required that Trust B would not terminate upon the sister's death if she was survived by the wife but would continue until the wife's death. The second dealt with the possibility of the sister's failure to survive the testator, and provided that Trust B would in this event not lapse but would be replaced by Trust A-1, to continue until the wife's death with, again, a limited power of invasion for her benefit.

Contrasted to these extensive provisions is the relatively simple invasion power in favor of the sister, which was strictly limited to 75 percent of the corpus of Trust B. Accordingly, the lapse of Trust A through the failure of the testator's wife to survive her husband would not result in the creation of a similar trust—the sister's benefit to be limited in all events to Trust B.

It is the wife's combination of limited invasion powers

which provides some insight into the testator's general intent. Clearly, Charles Ash wanted two trusts in existence at all times prior to his wife's death so that she would at all times be able, in case of emergency, to invade not only the corpus of Trust A but also that of one other trust. Thus, it was provided that no trust could terminate prior to the death of the wife and, if Trust B were to lapse, another trust would take its place. All contingent remaindermen had to survive the wife if they were to take under *any* trust because termination had to be delayed until that time in order to secure to the wife powers of invasion considered adequate by the testator. Upon the death of the wife, however, this primary nontax purpose of the plan was accomplished, and delay in termination was no longer justified except insofar as was necessary to adequately provide for the secondary object of the testator's concern, his sister. The precise wording of the will, discussed above, reflects a desire to fix all gifts at this crucial point, deferring enjoyment of those deriving from Trust B until the termination of that trust upon the sister's death.

It thus appears, from the specific wording of the will as well as from an overall view of the dispository scheme, that the testator contemplated vesting of all gifts upon the accomplishment of the primary nontax purpose of the plan, that is, the care and support of the wife after his death. This purpose was accomplished at the death of the wife, and we hold that all gifts to Frank Ash vested in him at that date.

The order is reversed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

McCOMB, J.—I dissent. I would affirm the order for the reasons expressed by Mr. Justice Taylor in the opinion prepared by him for the District Court of Appeal in *Estate of Ash* (Cal.App.) 47 Cal.Rptr. 196.

Respondents' petition for a rehearing was denied May 25, 1966.